PORTER COUNTY CHAPTER OF the IZAAK WALTON LEAGUE OF AMERICA, INC., et al., Petitioners,

and

The People of the State of Illinois, ex rel. William J. Scott, Attorney General of the State of Illinois, and The City of Gary, Indiana, Petitioners-Intervenors,

v.

The ATOMIC ENERGY COMMISSION and the United States of America, Respondents,

and

Northern Indiana Public Service Company, Respondent-Intervenor.

No. 74–1751.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1974.

Decided April 1, 1975.

Rehearing and Rehearing En Banc Denied May 28, 1975.

Robert J. Vollen, Edward W. Osann, Jr., Chicago, Ill., for petitioners.

James R. Thompson, U. S. Atty., Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., Carl Strass, Wallace H. Johnson, Dept. of Justice, Washington, D. C., Raymond M. Zimmet, Leon Silverstrom, U. S. Atomic Energy Commission, Washington, D. C., William H. Eichhorn, Hammond, Ind., for respondents.

David C. Jensen, Hammond, Ind., Charles A. Ruckman, Jay Robert Miertschin, Jr., and Michael I. Swygert, Gary, Ind., William J. Scott, Atty. Gen., Richard W. Cosby, Marvin N. Benn and Russell R. Eggert, Asst. Attys. Gen., Chicago, Ill., Maurice Axelrad, Washington, D. C., for intervenors.

Before FAIRCHILD, Chief Judge, and SPRECHER and TONE, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal involves the sensitive issue of whether the Atomic Energy Commission in approving the site of a commercial nuclear reactor gave due consideration to the population density and use characteristics of the site environs.

I

On August 24, 1970, Northern Indiana Public Service Company (NIPSCO) submitted its application for a construction permit and operating license for a 685 megawatt boiling water nuclear power plant to be built on the applicant's Bailly site on the southern shore of Lake Michigan, Westchester Township, Porter County, Indiana.

Under the Atomic Energy Act of 1954 as amended, 42 U.S.C. §§ 2011–2282, each application for a commercial license under section 2133, which must include a Preliminary Safety Analysis Report (PSAR) pursuant to 10 C.F.R. § 50.34(a), is reviewed by the staff of the Atomic Energy Commission (AEC) through the Division of Reactor Licensing (DRL) pursuant to 10 C.F.R. §§ 1.120 and 2.102(a), and by the 15-member Advisory Committee on Reactor Safeguards (ACRS) pursuant to 42 U.S.C. §§ 2039 and 2232(b).

In this case after the filing of 16 amendments by NIPSCO, ACRS filed its safety report on October 14, 1971, pursuant to 42 U.S.C. § 2232(b) and 10 C.F.R. § 2.102(c) and the AEC staff through DRL filed its Safety Evaluation Report (SER) on February 15, 1972. A general notice of hearing on the application for a construction permit dated December 21, 1971, had been published by AEC on December 29, 1971 in 36 Fed. Reg. 25175 (1971).

An Atomic Safety and Licensing Board (ASLB) of three members was constituted on January 12, 1972, pursuant to 42 U.S.C. § 2241 and at a prehearing conference held on May 9, 1972, at Valparaiso, Indiana, admitted as Joint Intervenors the following: Porter County Chapter of Izaak Walton League of America, Inc.; Concerned Citizens Against the Bailly Nuclear Site; Businessmen for the Public Interest, Inc.; and James E. Newman, Edward W. Osann, Jr., Mildred Warner and George Hanks. Bethlehem Steel Corporation was also admitted as a party intervenor.

Because of other commitments, members of the original ASLB were unable

to continue to serve and a Notice of Reconstitution of Board was issued on June 20, 1972. The reestablished ASLB conducted the evidentiary hearing.

In the meantime, NIPSCO had submitted an environmental report on January 7, 1971, which was amended three times. In July 1972, AEC issued a draft environmental statement and in February 1973, a Final Environmental Statement (FES).

ASLB held evidentiary hearings for 65 days on October 10–13, 1972 at Gary, Indiana, and between April 30 and November 14, 1973, at Valparaiso, Indiana. Oral arguments on proposed findings were held on February 19, 1974.[1]

The Initial Decision of ASLB authorizing the issuance of a construction permit was entered on April 5, 1974, and reported in Regulatory Adjudication Issuances of AEC. NIPSCO, LBP–74–19, RAI–74–4, 557 (April 5, 1974).

The Joint Intervenors appealed the Initial Decision, which was affirmed by the Atomic Safety and Licensing Appeal Board consisting of three members (ASLAB), pursuant to 10 C.F.R. § 2.785(a), on August 29, 1974. NIPSCO, ALAB–224, RAI–74–8, 244 (Aug. 29, 1974). Unless the AEC undertakes *sua sponte* a review of an ASLAB decision pursuant to 10 C.F.R. § 2.786, that decision becomes the final decision of the AEC, 10 C.F.R. §§ 2.770 and 2.785(a).[2] Thereafter any final decision is subject to judicial review in the court of appeals, 42 U.S.C. § 2239(b) and 28 U.S.C. § 2342(4), where the petitioner resides or has its principal office or in the Court of Appeals for the District of Columbia Circuit, 28 U.S.C. § 2343.

On September 13, 1974, the Joint Intervenors petitioned this court to review the August 29, 1974 order of ASLAB authorizing the issuance to NIPSCO of the construction permit and the September 5, 1974 order of ASLAB denying Joint Intervenors' motion for remand for further proceedings to consider NIPSCO's alleged participation in the proposed building of another nuclear plant in the early 1980's near Madison, Indiana. NIPSCO, ALAB–227, RAI–74–9, 416 (Sept. 5, 1974).

By orders of this court of September 20, October 3, and November 8, 1974, NIPSCO, the State of Illinois and the City of Gary, Indiana, were admitted as intervenors. On September 18, Joint Intervenors[3] moved in this court for a stay pending appeal and on October 4, the government moved for leave to reopen the administrative proceedings for further hearing on NIPSCO's proposal to construct a slurry wall at the site.

On October 16, 1974, we ordered (1) that the AEC order of August 29 be stayed pending review of that decision; (2) that AEC be permitted to reopen its administrative proceedings for further hearings upon the environmental impact of the building of a slurry wall; (3) that any action by AEC permitting the construction of a slurry wall be stayed pending further order of this court after AEC has rendered a final decision concerning the slurry wall; and (4) that an expedited briefing schedule be followed.

On November 15, 1974, the Joint Intervenors moved this court for clarification of the October 16 order to determine whether that order required NIPSCO to fill in the existing excavation on

---

1. In addition, prehearing conferences with all parties in attendance were held on May 9, 1972, at Valparaiso, Indiana; on September 6, 1972, at Hammond, Indiana; on November 1, 1972, at Schiller Park, Illinois; and on March 9, 1973, at Washington, D. C.

2. The Energy Reorganization Act of 1974, Pub. L.No. 93–438, 88 Stat. 1233 (Oct. 11, 1974), replaces AEC with an independent regulatory commission known as the Nuclear Regulatory

Commission (NRC). NRC is authorized to delegate its licensing and regulation of nuclear reactors to its Office of Nuclear Reaction Regulation under the supervision of a director. *Id.* § 203.

3. "Joint Intervenors" will hereafter continue to refer to the original intervenors, not including Bethlehem Steel Corporation. The intervenors in this court will be referred to as NIPSCO, Illinois and Gary.

the site as well as to cease any further site dewatering. On November 18, that motion was ordered taken with the case at the time of oral argument on December 11, 1974.

The arguments on appeal made by Joint Intervenors, Illinois and Gary are multi-faceted but all revolve ultimately upon whether AEC gave due consideration to the population density and use characteristics of the site environs.

## II

The proposed site for locating this commercial nuclear reactor is unique in many respects. The site is a reverse L-shaped 350-acre tract of land in Porter County, Indiana, on the south shore of Lake Michigan. The shorter base of the L runs from Lake Michigan to the south and constitutes the 107-acre tract on which the nuclear plant is sought to be located. The longer leg of the reverse L runs at a right angle from the southern end of the base from west to east and contains the remaining approximately 250 acres.

The reverse L-shaped nuclear site abuts the western boundary and the southern boundary of the western portion of the Indiana Dunes National Lakeshore, an irregularly shaped area that stretches some eleven miles along the south shore of Lake Michigan directly east of the 107-acre portion of the reactor site.

In 1966 Congress authorized the Secretary of the Interior to establish the Indiana Dunes National Lakeshore "[i]n order to preserve for the educational, inspirational, and recreational use of the public certain portions of the Indiana Dunes and other areas of scenic, scientific, and historic interest and recreational value. . . ." 16 U.S.C. § 460u.

On September 20, 1972, the National Park Service published a notice stating that "there has been acquired within the boundaries of the Indiana Dunes National Lakeshore an acreage which is efficiently administrable for the purposes of said Act and, therefore the Lake Shore is hereby established." 37 Fed.Reg. 19389

(1972). The National Lakeshore has thus far acquired 8300 acres or 85 percent of the land authorized by Congress to be acquired. Interspread within but not a part of the National Lakeshore acreage are the towns of Dune Acres and Beverly Shores and the Indiana Dunes State Park, which consists of an additional 2,200 acres and occupies approximately three of the eleven miles of beach shore.

Most of the 8300 acres is open dune and wetland. The ASLB found and concluded:

The location of the proposed facility on the shore of Lake Michigan to the north and bounded on the east by the Indiana Dunes National Lakeshore is characterized by its proximity to an environment of special qualities.

The Indiana Dunes region includes an exceptional combination of sand dunes, marshes, swamps and bogs, white sand beaches, and diversified flora and fauna—a natural area difficult to equal anywhere in the Nation. That portion of the Indiana Dunes National Lakeshore adjacent to the Bailly site and consisting of some 1200 acres is one of the best remaining areas in the Indiana Dunes. Starting at the edge of Lake Michigan and proceeding inland, it contains a cross-section including a wide beach of largely quartz sand, a low foredune covered by sparse vegetation; higher dunes, some active and sparsely covered and others having trees and other vegetation, rising from 25 to almost 200 feet above Lake level in a complex of blowouts, ridges, valleys, and interdunal ponds. This cross-section exemplifies terrestrial plant succession on dune sand as described by Cowles over 70 years ago. The dynamic nature of the Indiana Dunes has attracted scientists as an ideal outdoor laboratory to study the principles of ecological succession.

. . .

On the south of the dune complex, and to the north of the ancient shoreline of the Calumet stage of Lake Michigan . . . is a unique wetland area known as Cowles Bog which

contains an undrained pond or depression filled with water and largely covered by a relatively thick mat of vegetation. The fact that the Department of Interior's National Park Service has designated a sizeable portion of these unique natural settings abutting the proposed plant site as a Class IV Land namely "an outstanding natural area of special significance for public edification" . . . has weighed heavily on the Board's consideration of the potential impact of the proposed plant on its surroundings.

NIPSCO, LBP–74–19, *supra* at 586–87 (Finding 103).[4]

On the 107-acre site where the plant is sought to be located, NIPSCO operates two coal-fired electrical generating stations and a gas turbine peaking plant. The proposed nuclear facility would be built west of the three existing plants. On the west and south sides of the proposed site, Bethlehem Steel Corporation operates a steel plant employing some 7,500 employees. To the west of the Bethlehem plant is the proposed Port of Indiana.

In fact the area south and west of the site is a "vast industrial and urban complex [within which] are five major cities —Gary, Hammond, East Chicago, Whiting [all in Indiana] and Chicago, [Illinois] and numerous municipalities intermeshed . . . [within which] almost 7 million people live." (Joint Intervenors' Ex. 23).

The downtown Chicago loop area is about 30 miles from the site. Downtown Gary is about 12 miles and the eastern boundary of Gary is 5.25 miles from the proposed reactor building.

The cumulative population density data in the record shows actual and projected population at various distances from the Bailly site (October 1973 Stipulation; Staff Ex. 12) as follows:

| Distance from Bailly | Population 1970 | Population 1985 |
|---|---|---|
| 0—5 miles | 20,432 | 29,793 |
| 0—20 miles | 600,000 | 700,000 |
| 0—30 miles | 2,276,579 | 2,502,531 |
| 0—40 miles | 5,000,000 | 6,000,000 |

## III

In enacting the Atomic Energy Act of 1954, Congress found that the regulation of the facilities used in connection with the production and utilization of atomic energy was necessary, among other purposes, "to protect the health and safety of the public." 42 U.S.C. § 2012(e). Another purpose was to provide "a program to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes to the maximum extent consistent with the common defense and security and with the health and safety of the public." 42 U.S.C. § 2013(d).

"[N]o license [for a utilization or production facility] may be issued to any person within the United States if, in the opinion of the Commission, the issuance of a license to such person would be inimical to the common defense and security or to the health and safety of the public." 42 U.S.C. § 2133(d).

Finally, in connection with the applications for licenses to operate facilities, the applicant shall furnish such information "as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special nuclear material will be in accord with the common defense and security and will provide adequate protection to the health and safety of the public." 42 U.S.C. § 2232(a).

In evaluating the proposed site for a nuclear reactor the AEC has promulgat-

---

4. Similarly, the ASLAB said:
   The Lakeshore . . . encompasses beaches, sand dunes, marshes and bogs and is generally dedicated to public recreational purposes. Some of its features, the dune ridges and Cowles Bog National Landmark in particular, are undoubtedly unique.
   NIPSCO, ALAB–224, *supra* at 257.

ed regulations which provide that it "will take . . . into consideration" three factors:

(1) Characteristics of reactor design and proposed operation;

\* \* \* \* \* \*

(2) Population density and use characteristics of the site environs, including the exclusion area, low population zone and population center distance; and

(3) Physical characteristics of the site, including seismology, meteorology, geology and hydrology.

10 C.F.R. § 100.10.

Population density and use characteristics are further defined in 10 C.F.R. § 100.11. A license applicant is directed to assume (a) a fission product release from the core, (b) the expected demonstrable leak rate from the containment and (c) the meteorological conditions pertinent to his site, in order to derive the three area or population buffer zones of (1) exclusion area, (2) low population zone and (3) population center distance. The size or area of the first two buffer zones is determined by calculating that certain maximum radiation dosages, for stated periods after an accident, to an individual located on the outer boundaries of each zone not be exceeded. The third zone is one and one-third times the distance from the reactor to the outer boundary of the second zone.[5]

5. 10 C.F.R. § 100.11 provides in part:

(a) As an aid in evaluating a proposed site, an applicant should assume a fission product release from the core, the expected demonstrable leak rate from the containment and the meteorological conditions pertinent to his site to derive an exclusion area, a low population zone and population center distance. For the purpose of this analysis, which shall set forth the basis for the numerical values used, the applicant should determine the following:

(1) An exclusion area of such size that an individual located at any point on its boundary for two hours immediately following onset of the postulated fission product release would not receive a total radiation dose to the whole body in excess of 25 rem or a total radiation dose in excess of 300 rem to the thyroid from iodine exposure.

NIPSCO in its brief before us has emphasized the complexity of determining the first two buffer zones "because each of the principal elements . . . (fission product release, containment leak rate, meteorological conditions) depends upon the applicant's proposed reactor plant design and site," making "no single formula" possible. (Br. at 10–11). The regulations, and the record herein insofar as it pertains to NIPSCO's attempt to comply with them, confirm the complex nature of determining the critical factor of "population density and use characteristics of the site environs" in regard at least to the first two buffer zones. Because of the complexity of that determination, which necessarily subsumes the expertise of the AEC in reaching definitive conclusions, we turn first to the problem of determining the third buffer zone, the solution of which is relatively simple and merely involves a mathematical computation and the interpretation of non-technical language, an area where no expertise beyond normal adjudication is required. *See* 4 K. Davis, Administrative Law Treatise § 30.09 (1958 ed. and 1970 Supp.).

10 C.F.R. § 100.11(a)(3) describes the third buffer zone as:

A population center distance of at least one and one-third times the distance from the reactor to the outer boundary of the low population zone.

(2) A low population zone of such size that an individual located at any point on its outer boundary who is exposed to the radioactive cloud resulting from the postulated fission product release (during the entire period of its passage) would not receive a total radiation dose to the whole body in excess of 25 rem or a total radiation dose in excess of 300 rem to the thyroid from iodine exposure.

(3) A population center distance of at least one and one-third times the distance from the reactor to the outer boundary of the low population zone. In applying this guide due consideration should be given to the population distribution within the population center.

10 C.F.R. § 100.3(c) adds:

"Population center distance" means the distance from the reactor to the nearest boundary of a densely populated center containing more than about 25,000 residents.

The ASLB approved NIPSCO's and the AEC Regulatory Staff's calculations of the radii of the three population buffer zones as follows:

(1) Exclusion Area: 188 meters or .1168 mile. NIPSCO, LBP–74–19, *supra* at 561, 563 (Findings 14, 19);

(2) Low Population Zone: 2413 meters or 1.5 miles. *Id.* at 561, 563, 565 (Findings 14, 19, 24);

(3) Population Center Distance: 3219 meters or 2 miles. *Id.* at 565 (Finding 24).

As stated earlier, Findings (1) and (2) are based on radiation dosage calculations but (3) is simply 1⅓ times (2).

In accordance with these findings, the application of the 10 C.F.R. 100 regulations would require that no "densely populated center containing more than about 25,000 residents" be located at or nearer than two miles from the reactor.

The City of Portage, Indiana, had a population of 19,127 in 1970 but the ASLB found that "[u]pon questioning concerning the City of Portage, the Staff acknowledged the expected population of Portage by 1980 would exceed 25,000." NIPSCO, LBP–74–19, *supra* at

565 (Finding 24). Without so finding, ASLB referred to evidence that "the nearest boundary [of Portage] was 1.1 miles from the reactor site." *Id.* The briefs of both the government and NIPSCO accept the fact that the political or municipal or corporate boundary of Portage is approximately one mile from the reactor.[6]

■ Inasmuch as the site evaluation factors are promulgated to insure the safety of the adjoining population,[7] "[a]t the very least, consideration should . . . be given to the best available estimates as to what will be the population in the general vicinity of the reactor during the early years of actual operation."[8] The evidence here is uncontroverted that the population of Portage will grow to 25,000 between 1976 and 1977 and to about 29,000 in 1980, the early years of expected operation of this reactor.

■ The ASLB and eventually the ASLAB accepted the Regulatory Staff's argument that the political boundary of Portage was to be ignored and instead some amorphous, flexible and movable center or centroid of population was to be considered. The fatal error in this alleged logic is that AEC itself has defined "population center distance" as the distance from the reactor "to the *nearest boundary* of a densely populated center containing more than about 25,000 residents." 10 C.F.R. § 100.3(c) (em-

6. In discussing Joint Intervenor's contentions, the government states that "the *political boundary* of the City of Portage . . . was only one mile away," (Br. at 35) and NIPSCO states that "[Portage's] nearest municipal boundary is within 1.1 miles of the site." (Br. at 24).

7. 10 C.F.R. § 100.10 provides that "the site location and the engineered features included as safeguards against the hazardous consequences of an accident, should one occur, should insure a low risk of public exposure."

8. Southern California Edison Co., ALAB–248, RAI–74–12, 957, 960 (Dec. 24, 1974), where the ASLAB also said in regard to the San Onofre Nuclear Generating Station, Units 2 and 3:

Part 100 does not specify the precise time at which the number of persons within a

potential population center is to be measured. But, the purpose of the Part 100 criteria being to ascertain whether a particular site is suitable for reactor operation, it would make little sense to look only at the size of the population as of the time of the construction permit proceeding (several years prior to reactor operation).

[T]here is a strong likelihood that, sometime during the first few years of reactor operation (if not before), San Clemente will have a population of "more than about 25,000." Therefore, we see no reason why San Clemente should not be treated as the closest population center, and we accordingly do so.

*Id.* at 959–60. *See also* Long Island Lighting Co. (Shoreham Nuclear Power Station), ALAB–156, RAI–73–10, 831, 848 (Oct. 26, 1973).

phasis added). NIPSCO's own witness conceded that "the centroid itself doesn't have a boundary; it is a point."

■ Section 100.11(a)(3) also adds:

In applying this guide, due consideration should be given to the population distribution within the population center.

But giving such due consideration to population distribution does not eliminate the need to establish a boundary. Recently the ASLAB in another case found that the city limits of San Clemente, with an estimated future population likely to exceed 25,000, was within the population center distance and required a recalculation of radiation dosage distances.[9] We agree with AEC's ASLAB in that case, that a densely populated center may extend beyond the political or corporate limits of the 25,000 population unit, but there is neither reason nor sound safety policy to cut down the boundaries of that unit and make some hopeless attempt to construct imaginary boundaries.

The ASLB in this case recognized the fallacy of substituting centroids for boundaries [10] and found as follows:

To initially determine the heavily populated portion of the population center, the Staff used official Geological Survey (USGS) maps . . . on which densely populated areas are depicted in pink.

NIPSCO, LBP–74–19, *supra* at 565 (Finding 25).

The map relied upon for the "pink" sections (thus having boundaries) is the United States Department of the Interior geological survey of the Portage quadrangle. The map is "revised from aerial photographs taken 1967" and "field checked 1968." It must be kept in mind that the principal portion of the hearings in this case took place in 1973, at least five years later. The map purports to show individual dwellings as dots but the "pink," or what the map refers to as "red tint," simply indicates areas where individual dwellings are not shown. The map itself makes no representations or even references to population. The map clearly indicates the "corporate boundary of Portage" as being about one mile from the reactor.

In the critical determination of the "Population Center Distance," it would be ludicrous to attempt to reduce the political boundaries of the population center by such vague and indefinite references. Presumably, the cartographers could have tinted any part of the Portage quadrangle pink inasmuch as they indicated no guidelines which they used in selecting the areas so tinted.

■ Here the corporate boundary of Portage was about one mile from the reactor and the evidence showed that the boundary of census enumeration district 719 of Portage as well as the boundary of the enumeration district representing the entire City of Portage were both less than a mile from the reactor. Since both the ASLB and ASLAB found that

---

**9.** Southern California Edison Co. (San Onofre Station), ALAB–248, RAI–74–12, 957, 957–61 (Dec. 24, 1974). In a footnote, the ASLAB added:

> The "nearest boundary of a densely populated center" will not necessarily coincide with city or other political limits, for densely populated areas *may extend beyond such limits*. In this case, a portion of the dividing line between [Orange and San Diego] counties does also represent *the extreme southeastern limits* of San Clemente.

*Id.* at 960 n. 7 (emphasis added).

**10.** The Board said that it "was particularly concerned with intervenors claim that the Ap-

plicant had erred in choosing Gary as the nearest population center, that indeed Portage would be the proper choice and that the nearest boundary was 1.1 miles from the reactor site." NIPSCO, LBP–74–19, *supra* at 565 (Finding 24).

Member Walter H. Jordan of the ASLB said during the evidentiary hearings (Oct. 11, 1972 Tr. 613):

> [M]y reading of Part 100 does not say distance to the center; it says distance to the population center, but it does not mean the center of the population center in making that calculation. It is the environs of that population center, I believe.

the boundary of a densely populated center containing more than about 25,000 residents must be at least two miles away from the reactor, their conclusion that a construction permit be granted cannot stand.

This conclusion does not take into consideration the additional fact that the boundaries of each of the communities of Dune Acres, Porter and Burns Harbor are also less than two miles from the reactor and that their total population, when included with that of Portage and unincorporated county areas within two miles, of course, exceeds 25,000.

Nor does this conclusion take into consideration the fact, discussed in greater detail later, that the master plan for the Indiana Dunes National Lakeshore contemplates that "[a]ctive use of all of the facilities provided for in this plan, both in the State Park and in the Lakeshore, will permit a maximum visitation of about 87,000 persons a day." (Joint Intervenors' Ex. 23). Presumably, a large portion of such visitors would or could come within the two-mile limit of the third buffer zone, but such a conclusion is not necessary because the AEC siting regulations have been violated in this case on the basis of Portage alone.

It is also important to consider that Bethlehem Steel Corporation's 7,500 employees are located at about one mile from the Bailly site.

## IV

In view of the vast consequences of shutting off or delaying a potential source of considerable energy in these times of energy crisis, together with the effect of such an occurrence upon the economic, financial and industrial well-being and development of northern Indi-

ana, obviously we cannot finally act without giving very serious consideration to every possible factor which may conceivably bear upon the problem.

The factors in favor of granting the permit are so pervasive and weighty that they are impossible to ignore. Northern Indiana, as the entire country, has a need for additional generating power, employment and economic assistance. Witness after witness made so-called "limited appearance statements," appearing on their own behalf or on behalf of a group or organization or utility or union, requesting that a construction permit be issued in order to provide additional energy, jobs or stimuli to the economy. It is pertinent to note, however, that almost every witness in one fashion or another conditioned his request upon either his hope or confidence that AEC would adequately protect the public safety and, in some cases, also protect the environment.

In fact these circumstances militating in favor of the permit are so overwhelming that perhaps the AEC in a completely well-intentioned and good faith effort to accomplish ends which everyone seeks to accomplish has tended to become somewhat lax in assuring that the means employed thereby function in as safe a manner as possible so that one day we do not come to regret the proliferation of nuclear power.

Judge Oakes of the Second Circuit Court of Appeals recently noted in a dissent his concern "that the AEC is charged with the dual duty of passing on licenses on the one hand but promoting the use of atomic power on the other." Morningside Renewal Council, Inc. v. AEC, 482 F.2d 234, 240–41 (2d Cir. 1973), cert. denied, 417 U.S. 951, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).[11]

11. "AEC is supposed to stimulate the use of atomic energy and at the same time enforce the conditions of use imposed by its own regulations. There is sound basis for the argument that the two roles are incompatible." C. Allardice & E. Trapnell, The Atomic Energy Commission 123 (1974). *See also* Carolina Environmental Study Group v. AEC, 510 F.2d 796

at 801 (D.C.Cir., 1975), where the court said: "The possibility of such a conflict of interests is obvious."

For case and commentator documentation of "whether the regulatory agency is unduly oriented toward the interests of the industry it is designed to regulate, rather than the public interest it is designed to protect," see Mr. Jus-

Presumably, this observation has been largely invalidated by the Energy Reorganization Act of 1974 which purports to divide the promotional and research aspects of atomic energy, to be administered by the Energy Research and Development Administration (ERDA), from the licensing and regulatory functions, to be administered by the Nuclear Regulatory Commission (NRC). Nevertheless, the orders which we are presently reviewing occurred under the old AEC procedure and the merging of the diverse functions thereunder may explain to a certain extent some of the factors which we next consider.

### A

AEC appears to have given no direct consideration to the clustering of nuclear power plants around the southern end of Lake Michigan within relatively short distances from the density of population of metropolitan Chicago.

Although there appears to be no likelihood of a chain-reaction effect which would lead an accident from one plant to another, recent developments indicate that plants built within a contemporary time period tend to develop structural deficiencies at or about the same time.[12]

There are presently eight nuclear power plants within about 75 miles of down-town Chicago[13] and six more are in the planning stage.[14] The Bailly Generating Station, Nuclear-1, as this plant has been designated, would be the fifteenth plant clustered around metropolitan Chicago.

The AEC siting regulations as they pertain to the population center distance, discussed *supra* in Part III, provide in part:

> Where very large cities are involved, a greater distance may be necessary because of total integrated population dose consideration.

10 C.F.R. § 100.11(a)(3).

This distance referred to, in the circumstances of the present case, is, of course, two miles, but the regulations indicate AEC's awareness that consideration must be given to "very large cities" such as Chicago.

In what the ASLAB called "the draft of an internal staff working paper pertaining to allowable levels of population density around nuclear plant sites" (NIPSCO, ALAB–224, *supra* at 252), AEC's staff noted as of April 17, 1973:

> A long-standing policy of the Atomic Energy Commission[15] has encouraged siting of nuclear plants away from densely populated areas until additional operating experience has been obtained.[16]

---

tice Douglas' dissent in Sierra Club v. Morton, 405 U.S. 727, 745–48, 92 S.Ct. 1361, 1372, 31 L.Ed.2d 636 (1972).

**12.** In September 1974, the Dresden 2 plant at Morris, Illinois, developed a leak in a 4-inch bypass pipe in its emergency core cooling system. Inspections revealed cracks or preliminary indications of cracks in the same pipe in eight boiling water reactors in the United States and Japan. Recently the NRC closed 23 plants for inspection when five small cracks were discovered in 10-inch cooling pipes at Dresden 2. N.Y. Times, Feb. 6, 1975 at 24, col. 1.

**13.** About 30 miles away are Zion 1 and Zion 2 at Zion, Illinois (completed in 1972); about 50 miles away are Dresden 1 (1960), Dresden 2 (1970) and Dresden 3 (1972) at Morris, Illinois, and Donald C. Cook 1 (1973) and Donald C. Cook 2 (1974) at Bridgman, Michigan; somewhat further is Palisades (1971) at South Haven, Michigan. Allerdice & Trapnell, *supra* note 11, at 224–25.

**14.** About 50 miles away will be Braidwood 1 (1980) and Braidwood 2 (1981) at Braidwood, Illinois; somewhat further will be LaSalle 1 (1977) and LaSalle 2 (1978) at Seneca, Illinois, and Byron 1 (1979) and Byron 2 (1980) at Byron, Illinois. Allardice & Trapnell, *supra* note 11, at 224–25.

**15.** The staff footnote at this point referred to Statement of Consideration, Reactor Site Criteria, 10 C.F.R. Part 100, 27 Fed.Reg. 3509 (1962).

**16.** AEC Regulatory Staff Working Paper, Population Distribution Around Nuclear Power Plant Sites, Appendix A (April 17, 1973, released April 9, 1974). The staff paper also observed: "There has been no reason to take the additional incremental risk, however small, of incurring doses to a large metropolitan population as a result of any accident in the nuclear facility when other suitable sites, less densely populated, remain available." *Id.* at 1.

When the AEC made the staff working paper public on April 9, 1974, the AEC press release accompanying the paper virtually repeated one year later that:

> Under a policy established by the AEC in 1962, the siting of nuclear power plants at some distance from densely populated areas has not been encouraged until additional operating experience has been obtained.

AEC Press Release, T–160 at 2 (April 9, 1974).

In Power Reactor Development Co. v. International Union of Electrical Workers, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), the Supreme Court reversed the court of appeals which had set aside an AEC order issuing a construction permit, saying:

> The Court of Appeals put forward as an alternative basis for its decision the holding that under the law the Commission may not authorize the construction of a reactor near a large population center [35 miles from the center of Detroit and 30 miles from the center of Toledo] without "compelling reasons" for doing so, . . . 108 U.S.App.D.C. 97, 280 F.2d 645, at 651–652, and that no such reasons had been found by the AEC in this case. . . . [T]he position is without merit. The statute and regulations say nothing about "compelling reasons." Of course Congress (and the Commission, too, for that matter) had the problem of safety uppermost in mind, and of course that problem is most acute when a reactor, potentially dangerous, is located near a large city. But the Commission found reasonable assurance, for present purposes, that the reactor could be safely operated at the proposed location, and that is

enough to satisfy the requirements of law.

*Id.* at 414, 81 S.Ct. at 1538.[17]

■ In the *Power Reactor* case, the majority had disposed of "the fears of nuclear disaster" by pointing out that the issuance of the construction permit was only the first step, and that the applicant would be required to satisfy safety-of-operations requirements prior to obtaining an operating permit. In 1962, however, Congress amended the Atomic Energy Act of 1954 to eliminate the two-hearing requirement in effect at the time of the decision of *Power Reactor.* The mandatory hearing is now required only prior to the issuance of the construction permit. Union of Concerned Scientists v. AEC, 499 F.2d 1069, 1074–80 (D.C.Cir. 1974). It is now unquestionably true as Mr. Justice Douglas said in his dissent in *Power Reactor* that "the time when the issue of 'safety' must be resolved is before the Commission issues a construction permit." 367 U.S. at 419, 81 S.Ct. at 1540.

The Senate Report accompanying the Energy Reorganization Act of 1974, included the following observations:[18]

> Most commercial reactors now use a low-enriched uranium fuel that is not suitable for manufacture of bombs. They all produce plutonium as a by-product, however, which after reprocessing is potentially explosive and suitable for bombs. . . . At present, there are about 1 million pounds of plutonium and enriched uranium authorized in the licensed sector, about half of it of weapons grade. Plutonium, in addition to its potential explosiveness, is one of the most toxic substances known to man. One thirty-millionth of an ounce, less than a pol-

---

**17.** In a dissent concurred in by Mr. Justice Black, Mr. Justice Douglas said:

The construction given the Act by the Commission (and today approved) is, with all deference, a light-hearted approach to the most awesome, the most deadly, the most

dangerous process that man has ever conceived.

367 U.S. at 419, 81 S.Ct. at 1540.

**18.** S.Rep.No. 93–980, 93d Cong., 2d Sess., U.S. Code Cong. & Admin.News, pp. 5470, 5471 n. 1 (1974).

len grain will cause cancer if inhaled or swallowed.[19]

Despite these factors, the AEC gave no direct consideration to the effect of the existence of from eight to fifteen nuclear plants clustered around the Chicago metropolitan population.

## B

Not only did the AEC disregard what at least some of its expert staff deemed important population considerations, but it also disregarded its own past course of conduct in approving nuclear power sites.

The 1973 Working Paper prepared by the AEC Regulatory Staff (*supra,* note 16) analyzed all sites which up to that time (April 1973) had been given consideration for licensing, and listed each one together with both its maximum Site Population Factor (SPF)[20] and the SPF at 50 miles. Sixty-eight proposed and actual sites are listed and Bailly, which is 30 miles from downtown Chicago, has the sixth highest SPF at 50 miles. The five sites with a higher SPF at that distance according to rank were: (1) Ravenswood, (2) Indian Point, (3) Newbold Island, (4) Limerick and (5) Zion.

Ravenswood was withdrawn as a proposed site because of population consid-

erations.[21] In October 1973, the AEC informed the applicant utility that Newbold Island was not suitable because of population density. Because of the high population density at Limerick, the AEC staff issued special safety evaluations. With regard to high population density sites the staff stated:

> Indian Point and Zion are the highest population density sites which have received construction permits.

Staff Working Paper, *supra* note 16 at B–5.

> At the present time the staff uses an informal guideline that sites with a population density greater than that of an envelope of the Zion, Newbold Island and Indian Point site populations are not considered acceptable.

*Id.* at 1.

The Bailly site is closer to downtown Chicago than the Zion site.

Furthermore, if the granting of a construction permit to Bailly was allowed to stand, Bailly would achieve the dubious distinction of being nestled within one of the top few most dense population areas of all 68 sites proposed thus far in the United States for siting nuclear power plants.[22]

---

**19.** In 1974, according to NRC, the nuclear power industry experienced more than 1,400 "abnormal" events, four of which had a "directly significant" bearing on nuclear safety and radiation control. Chicago Sun-Times, Feb. 14, 1975 at 18, col. 1.

**20.** [A] weighting of the incremental populations around a reactor at the annular distances of 1, 2, 3, 4, 5, 10, 20, 30, 40 and 50 miles in comparison to a hypothetical site having a uniform population distribution of 1,000 people per square mile.

The weighting factors applied to the populations at the various annular distances are inversely proportional to the distance from the source. The inverse weighting is in consonance with the increased atmospheric dilution with distance for an assumed release of radioactivity emanating from a reactor. According to the weighting, a given population close to the site would be considered to present a higher risk than the same popula-

tion farther away. The weighting used is the distance (d) raised to the -1.5 power. Staff Working Paper, *supra* note 16 at B–9.

**21.** Another site, Burlington, which had a lower population figure at 50 miles but greater overall than Bailly, was also withdrawn because of population considerations.

**22.** The 1973 Working Paper also states that when population density is high

[T]he Regulatory Staff will request: (1) an analysis of alternative sites including a showing that the proposed high population density site offers significant advantages from the standpoint of environmental, economic or other factors; and (2) the inclusion of state-of-the-art engineered safety features to assure that the overall risk to the public has been minimized.

Staff Working Paper, *supra* note 16 at A–1.
In regard to the Bailly site "[the Regulatory Staff's] conclusion was that when only environmental matters were considered, the Bailly

### C

In September 1974, the AEC issued its Draft Regulatory Guide 4.7, General Site Suitability Criteria for Nuclear Power Stations (Sept. 1974),[23] which included the following:

Sites adjacent to some lands devoted to public use may be considered unsuitable. In particular, the use of some sites . . . close to special areas administered by Federal, State, or local agencies for scenic or recreational use may cause unacceptable impacts regardless of design parameters. Such cases are most apt to arise in areas adjacent to natural-resource oriented areas (e. g., Yellowstone National Park) as opposed to recreation-oriented areas (e. g., Lake Mead National Recreation Area).[24] Some historical and archeological sites may also fall into this category. The acceptability of sites near special areas of public use should be determined by consulting cognizant government agencies.

*Id.* at 14.

The agency which the AEC specifically indicates "should be consulted" in regard to a National Lakeshore is the National Park Service of the United States Department of the Interior. Congress has delegated its authority over the public lands of the Indiana Dunes National Lakeshore to the Secretary of the Interior. 16 U.S.C. §§ 460u–460u–9.

In response to the draft environmental statement, the Deputy Assistant Secretary of the Interior wrote on October 19, 1972:

We must conclude that the construction of the proposed Bailly Generating Station Nuclear-1 on the border of the Indiana Dunes National Lakeshore does not serve the highest public interest. Therefore, we recommend that the Atomic Energy Commission withhold the issuance of a construction license . . . at this site. . . .

Nathaniel Reed, the Assistant Secretary of the Interior testified before the ASLB and after establishing a host of impacts which the adjoining Bailly plant would have on the National Lakeshore, the following occurred:

Chairman . . .: So, therefore, you are—the Department is completely against the Bailly site irrevocably?

The Witness: Yes, I think that's an accurate statement.

Draft Regulatory Guide 4.7 continues:

It should be recognized that some as yet undesignated areas may be unsuitable for siting because of public interest in future dedication to public scenic, recreational, or cultural use. Relatively rare land types such as sand dunes and wetlands are prime candidates for such future designation.

Draft Regulatory Guide, *supra* at 14.

The ASLAB in this case found:

The unique features of the Indiana Dunes and wetlands have long been recognized by conservation-minded individuals.

NIPSCO, ALAB–224, *supra,* at 262.

To summarize, dunes and wetlands are prime candidates for future designation as public recreational sites, and if adjacent, or near to a proposed nuclear site it is rendered unsuitable. Yet long-recognized valuable natural areas which have already been designated as recreational sites and which abut hard against a pro-

site was superior but not overwhelmingly so." The ASLB "agrees with this conclusion." NIPSCO, LBP–74–19, *supra* at 624.

**23.** The Regulatory Guide states that it is "not [a] substitute . . . for regulations and compliance with them is not required. Methods and solutions different from those set out in the guides will be acceptable if they provide a basis for the findings requisite to the issuance or continuance of a permit or license by the Commission." Draft Regulatory Guide, *supra* at 1.

**24.** The poet Carl Sandburg is reported to have said:

The Indiana Dunes are to the Midwest what Yosemite is to California, Grand Canyon is to Arizona. They are a signature of time and eternity. Once lost, their loss would be irrevocable.

*Chicago Sun-Times,* Dec. 8, 1974 (Magazine), at 15.

posed nuclear site are deemed suitable. And although consultation with cognizant government agencies is intended to determine the acceptability of such sites, when the Department of the Interior upon consultation is "completely against the site irrevocably," that site is accepted.

The ASLAB summarized the Interior Department's and other witnesses' testimony and evidence of the chief factors of direct harm to the Lakeshore environment: (1) lowering the ground water table during construction would concomitantly lower the water level of bogs and ponds in the National Lakeshore, permanently damaging the delicate ecological systems in those unique wetlands; (2) operation of the facility's cooling tower will emit a water vapor plume that would (a) merge with chemical emissions from nearby industrial smokestacks to form an "acid mist" deleterious to Lakeshore biota, (b) deposit salt residues that will further injure the Lakeshore biota as well as pollute Lake Michigan and (c) worsen weather conditions in the area; (3) operations of the nuclear facility would pollute Lake Michigan with undesirable (including radioactive) waste materials; (4) use of ash ponds now on the Bailly property in conjunction with the new facility would pollute the National Lakeshore into which they assertedly drain; (5) intake of additional cooling water for the nuclear facility would destroy substantial quantities of fish in the Lake; and (6) the cooling tower would constitute a "visual intrusion" looming unattractively over the natural horizons of the Lakeshore. NIPSCO, ALAB–224, *supra* at 259.

In regard to the massive visual intrusion of the cooling tower 400–450 feet tall and 440 feet in diameter at its base, from the top of which "[d]uring operation, there will always be a visible plume . . . ranging in length from a few tower heights to several miles," (NIPSCO, LBP–74–4, *supra,* at 599 (Finding 131)), ASLB found:

> We find that the proposed natural draft cooling tower constitutes a manmade, visual intrusion which is an adverse environmental impact on the Bailly plant.

*Id.* at 600 (Finding 133).

This finding although "factored into" the total consideration was ignored.

### D

We have considered the population density and environs factors within the 30–75 mile zone around Bailly (IV A and B, *supra*) and within the two-mile (third buffer) zone around Bailly (III, *supra*) as well as the abutting environment (IV C, *supra*). Next we consider the two closest population zones (the first and second buffer zones).

The first zone or "exclusion area" is the place where the reactor is situated and a relatively small area immediately surrounding the physical plant.[25] In this case the ASLB and ASLAB approved an exclusion area of 188 meters or .1168 mile or approximately 1/10th of a mile.

Before examining in detail two AEC documents which we have briefly referred to earlier, the 1973 Working Paper on population distribution and Draft Regulatory Guide 4.7 on general site suitability criteria, it is necessary to make a few observations.

The AEC had been striving, prior to its recent demise in favor of NRC, to

---

25. 10 C.F.R. § 100.3(a) provides the definition:

"Exclusion area" means that area surrounding the reactor, in which the reactor licensee has the authority to determine all activities including exclusion or removal of personnel and property from the area. This area may be traversed by a highway, railroad, or waterway, provided these are not so close to the facility as to interfere with normal operations of the facility and provided appropriate and effective arrangements are made to control traffic on the highway, railroad, or waterway, in case of emergency, to protect the public health and safety. Residence within the exclusion area shall normally be prohibited. In any event, residents shall be subject to ready removal in case of necessity. Activities unrelated to operation of the reactor may be permitted in an exclusion area under appropriate limitations, provided that no significant hazards to the public health and safety will result.

**528**

standardize its approach to the licensing of nuclear power plants.[26] One of the more important benefits of increased standardization anticipated by AEC was the enhancement of reactor safety.[27]

Draft Regulatory Guide 4.7 is part of the standardization process,[28] and the 1973 Working Paper,[29] which the ASLAB dismissed as "simply a tentative position proposed by some members of the regulatory staff" (NIPSCO, ALAB–224, *supra* at 254), was accompanied by the AEC's own press release which stated:

The AEC is continuing work to develop generally applicable environmental siting guides for nuclear power plants. AEC Press Release, T–160 at 1 (April 9, 1974).

We use both the guide and the working paper, not as superseding the Commission's regulations, but merely as an expression of at least some AEC expertise to be examined in areas where the regulations are not clear or specific. We assume that if they offered no guidance, the AEC would not have issued and released them.

In Part III *supra,* we found that the Commission had violated its own regulations. In Part IV, we are examining other aspects of the AEC's action in granting the Bailly permit to determine whether, on balance, the extraordinary result of halting or delaying the development of needed energy is warranted by the Commission's violation of its regulations. In this latter inquiry we seek, not eschew, whatever expertise the AEC has to offer, including the guide and the working paper.

The working paper proposes the following regulatory position:

Applications for sites having a cumulative population projected from the date of application for a construction permit . . . greater than 30,000 within 5 miles, 500,000 within 20 miles or 2,000,000 within 40 miles should:

(a) Present an analysis of alternative sites, including a showing that the proposed site offers significant advantages from the standpoint of environmental, economic or other factors.

(b) Provide state-of-the-art engineered safety features to assure that the conservatively calculated consequences of postulated design basis accidents are significantly below the dose guidelines of 10 CFR Part 100.

(c) Have a minimum exclusion distance of at least 0.4 mile and a low population zone of at least two miles.

Staff Working Paper, *supra* note 16 at A–4.

It was stipulated that the projected population at Bailly in 1985 would be as follows:

| | |
|---|---|
| 0—5 miles | 29,793 |
| 0—20 miles | 700,000 |
| 0—40 miles | 6,000,000 |

In addition to consideration of alternate sites and added safety features, such a site calls for "a minimum exclusion distance of at least 0.4 mile" or 4/10th of a mile or four times greater than that proposed for Bailly.

---

**26.** Commission Policy Statement on Standardization of Nuclear Power Plants (April 28, 1972); Statement on Methods for Achieving Standardization of Nuclear Power Plants (March 5, 1973).

**27.** Trosten & Moore, Nuclear Power Plant Standardization: Promises and Pitfalls, 15 Wm. & Mary L.Rev. 527, 531 (1974); Shapar & Malsch, Proposed Changes in the Nuclear Power Plant Licensing Process: The Choice of Putting a Finger in the Dike or Building a New Dike, 15 Wm. & Mary L.Rev. 539, 541 (1974).

**28.** The Guide notes at the outset: "Regulatory Guides are issued to describe and make available to the public methods acceptable to the AEC Regulatory staff of implementing specific parts of the Commission's regulations, to delineate techniques used by the staff in evaluating specific problems or postulated accidents or to provide guidance to applicants." Draft Regulatory Guide, *supra* at 1.

**29.** The 1973 Working Paper is dated April 17, 1973, and was released by the AEC for public distribution about one year later, April 9, 1974, a few days after ASLB had rendered its decision in this case.

Draft Regulatory Guide 4.7 provides that "[b]ased on past experience, the Regulatory staff has found that a minimum exclusion distance of 0.4 mile . . . usually provides assurance that engineered safety features can be designed to bring the calculated dose from a postulated accident within the guidelines of 10 CFR Part 100." Draft Regulatory Guide, *supra* at 17–18.

If the exclusion area or first buffer zone in the present case were to be increased fourfold, it would extend beyond the NIPSCO-owned property into areas where NIPSCO could not "determine all activities"[30] and would raise serious questions of interference with the authority of the Secretary of the Interior over the National Lakeshore.[31]

A similar problem exists in connection with the second buffer area—the low population zone.[32] The low population zone here was established by the ASLB and ASLAB at 1.5 miles. The working paper establishes "a low population zone of at least 2 miles" (Staff Working Paper, *supra* note 16 at A–4) and the guide states that "the Regulatory staff has found that a distance of 3 miles to the outer boundary of the LPZ is usually adequate." Draft Regulatory Guide, *supra* at 18.

Even at 1.5 miles, the LPZ extends over about 640 acres of Class IV land, namely "an outstanding natural area of special significance for public edification." NIPSCO, LBP–74–19, *supra* at 586. But more significantly, it is anticipated that as many as 87,000 persons a day will visit the Dunes National Lakeshore and State Park (Joint Intervenors' Ex. 23). It must be presumed that a large number of people will be on the affected 640 acres at any particular time.

■ Although 10 C.F.R. § 100.3(b) speaks of the protection of residents, the need to protect visitors or transients regularly present is equally as great.[33] The ASLAB acknowledged that "[t]o be sure, were there any accident at Bailly, it might be necessary to evacuate visitors from the National Lakeshore as from other surrounding areas," (NIPSCO, ALAB–224, *supra* at 261 n.34), but dismissed this "remote contingency" by saying that the National Lakeshore superintendent could "work it out." *Id.* It appears to us that this problem should be worked out in advance by AEC and the

---

**30.** *See* note 25 *supra.*

**31.** The findings of ASLB indicated that the .1168 mile exclusion area would fall short of the shoreline of Lake Michigan (NIPSCO, LBP–74–19, *supra* at 561) and presumably totally within the NIPSCO-owned property. The Illinois Attorney General tells us in his brief that "the balance of the 0.4 mile requirement [the exclusion area] would extend into the National Lakeshore a distance of some 1,312 feet." (Br. at 9).

**32.** 10 C.F.R. § 100.3(b) provides:

"Low population zone" means the area immediately surrounding the exclusion area which contains residents, the total number and density of which are such that there is a reasonable probability that appropriate protective measures could be taken in their behalf in the event of a serious accident. These guides do not specify a permissible population density or total population within this zone because the situation may vary from case to case. Whether a specific number of people can, for example, be evacuated from a specific area, or instructed to take shelter, on a timely basis will depend on many factors such as location, number and size of highways, scope and extent of advance planning, and actual distribution of residents within the area.

**33.** In Southern California Edison Co., the ASLAB said:

To be sure, Part 100 refers expressly only to the need to protect "residents" within the low population zone. But we are aware of no basis for concluding that the Commission intended that term to be given a narrow, literal construction, which would exclude consideration of the safety of large numbers of transients regularly present within the low population zone. The need to protect such visitors is just as great as the need to protect permanent residents; if anything, greater steps will need to be taken to protect the visitors, who are likely to be relatively unfamiliar with the surrounding area and who will not have homes in which to take shelter. We thus decline to read the word "residents" as expressing a Commission intention to protect permanent residents but to ignore the safety of visitors.

Southern California Edison Co., ALAB–248, *supra* at 962.

utility seeking a license, rather than by what it is anticipated a third party may do.

Furthermore, the third party, in this case the Department of Interior, has not reacted in a very reassuring manner in regard to this problem. The Master Plan for the Dunes National Lakeshore (Joint Intervenors' Ex. 23) says:

> Because the population is expanding and outdoor recreational opportunities are restricted in the Calumet Region as well as in the National Lakeshore the potential number of visitors as peak times cannot be adequately handled.

And this is in reference to a quiet Sunday afternoon. What would occur if a large but unknown number of campers and visitors, unfamiliar with the area and with no nearby homes in which to take shelter, heard a public address announcement to evacuate the area due to a nuclear accident? Their path would be blocked on the north by Lake Michigan and on the west and south by NIPSCO's and Bethlehem Steel Corporation's plants and industrial complex. It strains credulity to expect that this problem will work itself out and it is ridiculous to in effect say that it should be left to fortune.

What we have considered in sections A through D above is concerned with "population density and use characteristics of the site environs." 10 C.F.R. § 100.10(b).

### V

We are compelled to conclude that since the AEC did not comply with its own applicable regulations (Part III, supra), which are binding on it,[34] and since there are so many persuasive reasons for requiring it to comply with those regulations in this case (Part IV, supra), the AEC's decision of August 29, 1974 is unlawful and is hereby set aside.[35]

In view of this result and in response to Joint Intervenors' motion for clarification of our October 16 stay order, which now becomes permanent, we hold that NIPSCO is required to fill in the existing excavation on the site as well as to cease any further site dewatering.

TONE, Circuit Judge (dissenting).

Congress committed to an expert administrative agency, not to the courts, the responsibility both of protecting public safety and health and of accommodating energy needs and environmental interests in the licensing and regulation of commercial nuclear power plants. At the time of the administrative proceedings we are reviewing, that agency was the Atomic Energy Commission.[1] We of course owe the expertise of an agency responsible for regulating the use of nuclear power the same deference we owe the expertise of other agencies, even though we have the normal human dis-

---

**34.** Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 631 (1954). See also Judge Irving R. Kaufman, Judicial Review of Agency Action: A Judge's Unburdening, 45 N.Y.U.L. Rev. 201 (1970).

**35.** Judicial review of AEC action pursuant to 42 U.S.C. § 2239(b) is in accordance with section 10 of the Administrative Procedure Act which provides in part:

> The reviewing court shall— . . .
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discre-

tion, or otherwise not in accordance with law;

> \* \* \* \* \* \*
> (D) without observance of procedure required by law . . . ..

5 U.S.C. § 706.

**1.** The Energy Reorganization Act of 1974 (88 Stat. 1233) transferred "all the licensing and related regulatory functions of the Atomic Energy Commission," including the functions of the Atomic Safety and Licensing Board Panel and the Atomic Safety and Licensing Appeal Board, to the newly-created Nuclear Regulatory Commission. (§§ 201(f) and (g) of the Act.) Despite what is said in the introductory portion of Part IV of the majority opinion, I take it there can be no dispute that the standards of review are the same for the orders of the old and the new commissions.

trust of such an awesome force as nuclear reaction and fear that the consequences of a miscalculation may be catastrophic. Congress no doubt had the same distrust and fear, but it nevertheless chose the policy of providing for the development of nuclear power as a source of energy and relied upon the agency's expert judgment to protect society's interests. Congress limited the courts' role to review of the agency's actions in accordance with the Administrative Procedure Act. I think that in this case the court has overstepped the limits of that role and substituted its judgment for that of the agency.

The court's decision turns primarily upon the meaning of the words, "the nearest boundary of a densely populated center containing more than about 25,000 residents," which appear in the Commission's regulation dealing with reactor site criteria. (10 C.F.R. § 100.11(a)(3) (1974).) The court holds that these words refer to the political boundary of a city and not, as the agency construed them, "that portion of the population center at which the dense population starts." In rejecting the argument that the words refer to a political boundary, the Atomic Safety and Licensing Board, whose order was affirmed by the Appeals Board, noted that the regulation also provides,

> "In applying this guide [that the population center distance be at least one and one third times the distance to the low population zone boundary], due consideration should be given to population distribution within the population center," ,

and concluded that,

> "giving due consideration to the low population density of those areas closer than 4.5 miles to the Bailly reactor, principally industrial areas of the City of Portage, the provisions of Part 100 [of the regulations] with respect to population center distance are satisfied."

The Atomic Energy Commission's interpretation of its own regulation is entitled to "that respect which is customarily given to a practical administrative construction of a disputed provision." Power Reactor Development Co. v. Electrical Union, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). "[S]ince the meaning of the language is not free from doubt, we are obligated to regard as controlling a reasonable, consistently applied administrative interpretation . . .." Ehlert v. United States, 402 U.S. 99, 105, 91 S.Ct. 1319, 1323, 28 L.Ed.2d 625 (1971). The only suggestion in the court's opinion in the case at bar that the agency has not consistently interpreted the disputed regulation is the reference to Southern California Edison Co. (San Onofre Station), ALAB–248, RAI–74–12, 957 (Dec. 24, 1974). The Commission's position in that case, however, that city boundaries are not controlling when densely populated areas extend outside those boundaries, is entirely consistent with its position here. In both cases the location of populated areas rather than of political boundaries is viewed as controlling.

I do not understand why that is not the most sensible interpretation of the regulation, as well as the one to which we owe respect as the agency's expert interpretation. Since the purpose of the regulation is to separate the reactor site from densely populated areas, we would expect the draftsmen to be concerned with the location of those areas rather than political lines. Nowhere in the regulation is there any reference to a city, village, town, or other political subdivision. Instead the terms used are "population center" and "densely populated center" (10 C.F.R. §§ 100.3(c), 100.11(a)(3)(1974) ), evidencing an intention to describe de facto concentrations of population rather than political subdivisions. The term "boundary" is used with reference to such a concentration or center, as the agency correctly concluded.

The court's discussion of the evidence concerning population distribution, which is found near the end of Part III of the opinion, appears to be intended to illus-

trate the difficulty of finding the boundaries of a de facto population center, rather than an alternative holding that, even if the boundary referred to is that of such a center, the agency's finding as to the location of the boundary is not supportable. Nevertheless, implicit in the court's discussion is a rejection of the agency's findings on this point, which I think are supported by substantial evidence, as required by section 10 of the Administrative Procedure Act (5 U.S.C. § 706(2)(E)), under which our review is conducted.[2] It is true that the map used in the presentation of the evidence on population center distances was five or six years old. But there was ample additional evidence, which we would surely find sufficient if we were reviewing the judgment of a district court or an order of another agency, that the land within the two-mile population center distance, and indeed beyond, is not densely populated;[3] that its present and probable future development is principally industrial;[4] and that extensive residential development would be unlikely anywhere within the two-mile zone because of the industrial zoning, the industrial uses already there, and the availability of land elsewhere which is more desirable for residential use. It was for the agency and not this court to weigh and appraise that evidence.

Other grounds put forward in Part III of the court's opinion seem to me to be unpersuasive. The outer border of the census enumeration district, which no one contends is the boundary referred to in the regulation and which, within the two-mile radius, coincides with the city limits of Portage, has no relevance to population density; census enumeration districts often include large tracts where no one at all lives, as is the case here.[5]

2. Petitioners appear not to have preserved for judicial review the sufficiency of the evidence on this point. They did not challenge the sufficiency of this evidence in their 78-page brief before the Appeal Board, though they later attempted to do so in a supplemental brief, which the Board refused to allow them to file. Cf. United States v. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952).

3. It is noteworthy that the parties opposing the agency before the court, while criticizing the map as too old and too vague, do not contend that the record shows, or that there are in fact, densely populated areas within the two-mile zone. The reason for this is suggested by the 1970 Census, of which we may take judicial notice. About 95 per cent of the land within the City of Portage that is also within the two-mile radius appears to be north of the Penn Central (formerly New York Central) railroad track. As we read the 1970 Census, it shows that the census taker found no residents in that area. The remaining 5 per cent of the land which is within both Portage and the two-mile radius represents what appears to be less than 5 per cent of the land area in the next census block to the south of the railroad. A total of 81 residents were found in that entire census block. See U.S. Bureau of the Census, *Census of Housing: 1970 Block Statistics* Final Report HC(3)–68 Chicago Ill.-Northwestern Indiana Urbanized Area (1972).

As to the argument that the pink areas on the map have no probative value, we note testimony in the record that "the definition of pink tinted areas here by the Geological Survey is that population density which is too sense [obviously a misprision for 'dense'] to indicate the houses by themselves," because if individual houses were indicated "there would be no opportunity to indicate the other significant landmarks." This testimony is consistent with U.S. Dep't of Interior, Geological Survey, *Topographic Map Information and Symbols* (1972), which explains that "red tint" is used to represent urban areas, in which only landmark buildings are shown. The nearest periphery of the nearest pink area was approximately four and one-half miles away from the proposed reactor site.

4. The evidence shows that the bulk of the land within the two-mile radius and not within the National Lakeshore is zoned for industrial use and, to the extent it is developed, is devoted primarily to industrial uses, and that all of the small part of Portage within the two-mile radius is in the industrial category, which explains why few, if any, persons live in that area. See note 3, *supra*.

5. According to the 1970 Census there were no residents in the area about two and one-half miles long and over one mile wide running generally west from the proposed site along the shore of the lake to Burns Waterway. That area, which includes all but about 5 per cent of the part of Portage that is within the two-mile radius (see note 3, *supra*), is the part of Census Enumeration District 719 (to which the majority refers) nearest to the site.

Census enumeration districts are "small population areas averaging about 250 housing

The regulation cannot reasonably be interpreted to mean that other small residential communities near the proposed site are to be deemed within the densely populated center even though they are separated from it by substantial distances.

The subjects discussed in Part IV of the opinion are not set forth as grounds for the court's decision, and I shall not, therefore, lengthen this dissent by discussing them in detail. It is enough to say that the location of this plant in relation to others in the area is a matter peculiarly within the province of the Commission; that we are in no position to judge whether the agency's rulings on other license applications on entirely different records of which we have little knowledge are consistent with its ruling here; that the agency carefully considered the environmental impact on the National Lakeshore and its findings on that subject find ample support in the evidence; that Congress did not give the Assistant Secretary of the Interior a veto power over the Commission's decision of issues entrusted to it by Congress for decision; and that we cannot reverse the Commission for applying its regulations instead of proposals and views put forward by some of its staff but not adopted by the Commission. In this part of the opinion, as in Part III, the court has invaded the function of the Commission.

### ORDER UPON DENIAL OF PETITIONS FOR REHEARING

On consideration of the petitions for rehearing filed in the above-entitled cause, a majority of the panel voted to deny the petitions. However, in the government's petition for rehearing, the government questioned whether this court "intends to enjoin NIPSCO from building a nuclear plant at the Bailly site forever" and argued that the Nuclear Regulatory Commission should have an opportunity to take "a fresh look at the question" and to determine whether the low population zone "could be cut down enough, and whether that would require additional safety features for the plant."

The opinion and judgment in this case merely set aside the Atomic Energy Commission's decision of August 29, 1974 affirming the issuance of a construction permit. We find nothing in the Atomic Energy Act of 1954 or the Energy Reorganization Act of 1974 which would prevent NIPSCO from applying for another license or would prevent NRC from considering such new application.

This court's reference at the close of the opinion to making the stay permanent and to filling in the existing excavation pertains solely to action in reliance upon the license set aside by the court's judgment.

It is hereby ordered that the petitions for rehearing be, and the same are hereby, denied.

TONE, Circuit Judge, adheres to the position stated in his dissent.

### ORDER UPON DENIAL OF SUGGESTION FOR REHEARING EN BANC

On consideration of the suggestion for rehearing *en banc* filed in the above-entitled cause, Circuit Judges Pell, Stevens, Tone and Bauer voted to order a rehearing *en banc*. Circuit Judges Fairchild, Cummings and Sprecher voted to deny rehearing *en banc*. Circuit Judge Swygert took no part. Accordingly, the suggestion for rehearing *en banc* failed to

units and are defined by the Census Bureau" for use in "the collection and tabulation of population and census data." U.S. Bureau of the Census, *1970 Census Users' Guide pt. I,* 87–88 (1970). Criteria used in determining enumeration districts are "(1) the estimated population size of the ED should constitute an adequate enumerator workload; and (2) the enumeration district must fall within the boundaries of certain areas for which the results are to be tabulated, i.e., tracts, cities, minor civil divisions, etc." *Id.* at 88. These districts are "administrative areas" and represent "a work assignment for a single enumerator." They "may range in size from a city block to several hundred square miles, but usually encompass from 750 to 1,500 persons." *Id.* at 22.

**534**

receive the votes of a majority of the circuit judges in regular active service and the suggestion is denied. 28 U.S.C. § 46.

It is hereby ordered that the suggestion for rehearing *en banc* be, and the same is hereby, denied.