533 F.2d 1011
 9 ERC 1282, 6 Envtl. L. Rep. 20,463
 PORTER COUNTY CHAPTER OF the IZAAK WALTON LEAGUE OF AMERICA,
INC., et al., Petitioners,
and
The People of the State of Illinois ex rel. William J.
Scott, Attorney Generalof the State of Illinois,
Petitioners-Intervenors,
v.
The ATOMIC ENERGY COMMISSION and the United States of
America, Respondents,
and
Northern Indiana Public Service Company, Petitioners-Intervenors.
 No. 74-1751.
 United States Court of Appeals,
Seventh Circuit.
 April 13, 1976.
Rehearing and Rehearing En Banc Denied June 1, 1976.
 
 Robert J. Vollen, Edward W. Osann, Jr., Chicago, Ill., for petitioners.
 Samuel K. Skinner, U. S. Atty., Chicago, Ill., Carl Strass, Dept. of Justice, Wallace H. Johnson, Dept. of Justice, Raymond M. Zimmet, Leon Silverstrom, U.S. Atomic Energy Com., Washington, D.C., William H. Eichhorn, Hammond, Ind., Peter L. Strauss, Nuclear Regulatory Com., Washington, D.C., for respondents.
 David C. Jensen, Hammond, Ind., Charles Ruckman, Gary, Ind., William J. Scott, Atty. Gen., Richard W. Cosby, Asst. Atty. Gen., Chicago, Ill., Maurice Axelrad, Washington, D.C., William T. Hart, Chicago, Ill., for intervenors.
 Michael I. Miller, Chicago, Ill., for amicus curiae.
 ON REMAND FROM THE SUPREME COURT
 Before FAIRCHILD, Chief Judge, and SPRECHER and TONE, Circuit Judges.
 PER CURIAM.
 
 
 1
 This proceeding to review an Atomic Energy Commission order granting a permit to construct a nuclear power plant was remanded to us for further proceedings in Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America, 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975). Our jurisdiction is derived from 42 U.S.C. § 2239(b) and 28 U.S.C. § 2342(4). We hold that the agency's order is valid and deny the petition for review.
 
 
 2
 The history of these proceedings, which is recounted in more detail in this court's earlier decision, Porter County Chapter of the Izaak Walton League of America v. Atomic Energy Commission, 515 F.2d 513 (7th Cir. 1975), may be summarized as follows: In 1970 Northern Indiana Public Service Company (NIPSCO) filed with AEC an application for a construction permit and operating license for a nuclear facility to be constructed on the company's Bailly site, on the southern shore of Lake Michigan, in Porter County, Indiana. The application was opposed by various organizations and individuals, petitioners herein, who were permitted to intervene. Hearings were held by the Commission's Atomic Safety and Licensing Board (ASLB) in the fall of 1972 and throughout 1973. ASLB initially authorized issuance of the construction permit on April 5, 1974. RAI-74-4, 557. The decision was appealed by petitioners to the Commission's Atomic Safety and Licensing Appeal Board (ASLAB), which affirmed. RAI-74-8, 244 (August 29, 1974). That decision subsequently became the final decision of AEC. See 10 C.F.R. §§ 2.770, 2.785(a). After the filing of the petition for review in this court, the State of Illinois and the City of Gary, Indiana, were permitted to intervene on the side of petitioners. By a divided panel, this court set aside the order on the ground that issuance of the permit was in violation of an AEC regulation setting a minimum distance between the site for a nuclear facility and the nearest boundary of a densely populated center of over 25,000 residents. 515 F.2d 513 (1975). On writ of certiorari, the Supreme Court reversed the judgment and remanded the case for consideration of arguments in opposition to the permit not decided in our previous opinion. 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975).
 
 I.
 
 3
 The argument we address first is that, despite Congress' grant of exclusive licensing authority to AEC,[1] that agency lacks jurisdiction to approve the site, because the plant will encroach on adjacent federal lands administered by the Department of Interior. These lands, consisting of some 8,300 acres known as the Indiana Dunes National Lakeshore, abut the eastern boundary of the 107-acre tract on which NIPSCO proposes to build the nuclear plant. See 515 F.2d at 517-518. The Department's environmental concerns with the Bailly site were noted in our earlier opinion. 515 F.2d at 526-527. Relying on United States v. Alford, 274 U.S. 264, 47 S.Ct. 597, 71 L.Ed. 1040 (1927), Camfield v. United States, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), United States v. Cappaert, 508 F.2d 313 (9th Cir. 1974), cert. granted, 95 S.Ct. 2654, 422 U.S. 1041, 45 L.Ed.2d 692 (1975), and analogous cases in which the United States has been held to be entitled to equitable relief against uses of privately owned land which detrimentally affect adjoining government property, petitioners contend that AEC approval of the site is barred. The Department of Interior has not advanced such a contention.
 
 
 4
 Most of the cases relied upon by petitioners are readily distinguishable because they involve relief granted pursuant to specific statutory prohibitions which are not applicable here. But even assuming the Department of Interior, by exercising its statutory power of supervision over the National Lakeshore, cf. United States v. Cappaert, supra, could obtain injunctive relief against threatened irreparable injury to lands within its custody from sources outside, we could not justify interruption of the AEC licensing process when the Department has not sought such relief. While AEC's authority to issue licenses and construction permits should be reconciled to the fullest extent possible with the interest of the Department of Interior in protecting the National Lakeshore, nothing in the authorizing legislation for either agency suggests that the Department's views on the advisability of an adjoining nuclear facility are to be controlling. AEC has considered the Department's comments and has given attention to the environmental effects of the Bailly plant upon the National Lakeshore, as the law requires. It has concluded that with the restrictions and controls it will impose as conditions to approval of the construction permit, including two monitoring programs which will detect changes in chemical and water level composition of the dunes area, the environmental impact of construction and operation of the nuclear plant will not be substantial[2] enough to require disapproval of the site. This was a determination the agency had authority to make.
 
 
 5
 In a related argument intervenor State of Illinois contends that extension of the exclusion area and low-population zone, see 515 F.2d at 520, surrounding the site into the National Lakeshore "is incompatible with Interior's mandate to 'preserve . . . the Indiana dunes' . . .." The exclusion area, however, will not extend into the Lakeshore area. As for the boundaries of the low-population zone, they are simply one factor to be considered in evaluating various sites, as noted by ASLAB in its final decision:
 
 
 6
 "(T)he creation of a 'low population zone' does not impose and is not meant to impose restrictions on the use of land within the perimeters of the zone. Concern that the Bailly low population zone might impinge on the Interior Department's management prerogatives in the Indiana Dunes National Lakeshore is thus a non sequitur." RAI-74-8, 261.
 
 
 7
 The jurisdictional arguments are therefore without merit.
 
 II.
 
 8
 In view of the Supreme Court's decision, little is left of petitioner's argument that the order is not in compliance with AEC's siting regulations, which provide, see 515 F.2d 519-520, for three population buffer zones around the nuclear facility. 10 C.F.R. Part 100. Petitioners' remaining contention relating to the siting regulations is that the evidence is insufficient to support the finding that "the distance from the reactor to the nearest boundary of a densely populated center containing more than about 25,000 residents," 100 C.F.R. § 100.3(c), is two miles. Once it has been determined, as the Supreme Court did, that political boundaries are not controlling, the record and pertinent census data adequately support the agency's finding.[3]
 
 
 9
 Intervenor State of Illinois argues in this connection that AEC's issuance of the construction permit to NIPSCO is inconsistent with the agency's recent rejection of another utility's application for a permit at a site having a lower siting population factor than bailly, on newbold island, New Jersey. So long as AEC's regulations are complied with, as they are here, population density is only one factor in site evaluation. The record of the New Jersey case is not before us, and an intelligent comparison could not be made without the full records for both applications. Cf. American Meat Institute v. Environmental Protection Agency, 526 F.2d 442, 466 (7th Cir. 1975).
 
 III.
 
 10
 Petitioners also argue that, without regard to the distance between the proposed reactor and the boundary of the nearest densely populated center with over 25,000 residents, AEC failed to give sufficient weight to the density of population surrounding the Bailly site. Specifically, petitioners seek to apply an AEC staff working paper, dated April 17, 1973, and released April 9, 1974, shortly after ASLB's initial decision was issued, and the Nuclear Regulatory Commission's[4] Regulatory Guide 4.7 (revision 1), dated November 1975. Petitioners stress the following passage, which was added in the final version of the Regulatory Guide:
 
 
 11
 "If the population density, including weighted transient population, projected at the time of initial operation of a nuclear power station exceeds 500 persons per square mile averaged over any radial distance up to 30 miles . . . special attention should be given to the consideration of alternative sites with the lower population densities."
 
 
 12
 Petitioners calculate there to be 806 persons per square mile within a 30-mile radius of the Bailly site.
 
 
 13
 The working paper and a draft version of the Regulatory Guide, which is similar to the final version now before us, were said in our prior opinion to be relevant in determining "whether, on balance, the extraordinary result of halting or delaying the development of needed energy is warranted by" what the majority then perceived to be a violation of AEC's own regulations. 515 F.2d at 528. The court did not, however, hold that AEC's failure to apply the working paper and Regulatory Guide criteria was an independent ground for reaching that result.
 
 
 14
 Unlike regulations, both the working paper and the Regulatory Guide are advisory rather than obligatory.[5] The working paper by its terms applies to applications docketed after January 1, 1974 (NIPSCO's application was filed in 1970).[6] The Regulatory Guide, having been issued after the entry of the order under review, is likewise of doubtful applicability. Cf. Douglas, J., concurring, 423 U.S. at 12, 96 S.Ct. at 172, 46 L.Ed.2d at 157. Even if these documents were applicable, they would not require setting aside the agency order. Both documents stress the importance of considering less-densely populated sites and the use of additional safety measures, where appropriate, if alternative siting is not available. We conclude below that proper consideration was given to other sites, and the safety measures taken here are not the subject of attack.
 
 IV.
 
 15
 Finally, petitioners argue that AEC has failed in several respects to comply with the requirements of the National Environmental Policy Act (NEPA),42 U.S.C. §§ 4321-4347. Adopted in late 1969, NEPA requires, in section 102(2) (C), 42 U.S.C. § 4332(2)(C), a detailed statement of environmental impact to be included in all federal agency proposals "significantly affecting the quality of the human environment." AEC regulations were amended in 1971 to provide a procedure for insuring compliance with NEPA. At the time relevant to these proceedings, the regulations required all applicants for nuclear plants to submit a detailed environmental report for AEC staff analysis. 50 C.F.R. Part 50, App. D, A(1) (1974).[7] NIPSCO filed its original report in 1971 and twice amended it in 1972. The staff then drafted its own preliminary statement of environmental considerations, which included an assessment of adverse environmental effects, alternatives to the proposed action, anticipated costs in relation to net benefits, and various other environmental matters. The preliminary statement was then transmitted to interested parties,[8] for comment, after which the staff completed a final environmental impact statement in February, 1973. Id. at App. D, A(6). The final statement was reviewed, as the regulations required, by ASLB, ASLAB, and the Commission itself, whose findings and conclusions which differed from those in the staff's final statement were deemed to modify the statement. Id. at App. D, A(11).
 
 A.
 
 16
 Petitioner's contention that adequate consideration was not given to alternative sites cannot be sustained. At least two alternative sites were rejected because of population reasons. The third alternative, the Schahfer site, which is on the Kankakee River, is the only one petitioners contend should have been given more serious consideration. Schahfer was found to be inferior to Bailly on both environmental[9] and economic[10] grounds. And, while the lower population density of Schahfer weighed in its favor, ASLB concluded that this factor should not be controlling. That conclusion was based upon ASLB's consideration of nine classes of possible accidents which AEC hypothesized conceivably could occur at the plant, ranging in severity from trivial (class 1) to very serious (class 9). In general terms the more serious the accident, the less likely it is to occur. ASLB determined that accidents of class 1 through class 8 posed no significant risks to residents at either site, and that "because of the improbability of a class 9 accident with its concomitant risks, no significant weight can be given to the low population density surrounding the Schahfer site in (the Board's) cost-benefit analysis." RAI-74-4, 624. Petitioners contend that this rejection of Schahfer was unjustified in light of evidence that the possibility of a class 9 accident cannot be predicted with accuracy.
 
 
 17
 A class 9 accident "involves concurrent rupture of the three-foot thick concrete containment vessel and the several inches of steel surrounding the reactor core, resulting in the exposure of the radioactive core to the atmosphere," with severe consequences. Carolina Environmental Study Group v. United States, 166 U.S.App.D.C. 416, 510 F.2d 796, 798-799 (1975). See also "The Struggle Over Nuclear Power," Time, 69-70 (March 8, 1976). Such an accident is a remote possibility which some experts have viewed as incapable of being stated in numbers and which others have estimated as being "from a chance of one on 100,000 to one in a billion per year for each larger reactor." AEC report WASH-740, "Theoretical Possibilities & Consequences of Major Accidents in Large Nuclear Power Plants," at viii (1957), cited in Carolina Environmental Study Group, supra, 510 F.2d at 799. See also Ecology Action v. United States Atomic Energy Commission, 492 F.2d 998, 999 (2d Cir. 1974) ("one in 10 million during a year's operation").
 
 
 18
 Variations on the argument that the Bailly site should have been rejected on population density grounds are presented by intervenor City of Gary. These contentions were not made before the agency. Gary argues that fuller consideration should have been given in the environmental impact statement to the consequences of a class 9 accident, and that the low probability of such an accident cannot be considered by the licensing authority in determining its environmental impact.
 
 
 19
 Similar arguments were rejected by the District of Columbia Circuit in Carolina Environmental Study Group, supra, 510 F.2d at 798-800. The AEC staff's extensive analysis of accident probabilities and effects, which was uncontroverted, provides sufficient record support for ASLB's conclusion. See Sierra Club v. Froehlke, 486 F.2d 946, 950 (7th Cir. 1973). The record indicates, to the extent it is possible to do so, the degree of remoteness achieved, as stated in the final environmental statement, by "(d)efense in depth (multiple physical barriers), quality assurance for design, manufacture, and operation, continued surveillance and testing, and conservative design . . .." The question comes down to whether the possibility of such an accident is sufficiently real that reactors should be located only in unpopulated areas. Under the law, this must be decided by the expert body empowered by Congress to make such decisions.
 
 B.
 
 20
 Petitioners next assert that issuance of the construction permit violated NEPA because AEC's analysis of the need for additional power provided by a nuclear facility failed to consider scheduled additions to NIPSCO's existing plant and the amount of purchasable power available to it from other companies. Neither argument has merit. The only scheduled addition to which the record makes reference is a 500-megawatt, fossil-fueled unit to become available in 1975. A comparison of NIPSCO's own evaluation of its needs and ASLB's projections show that this additional unit was taken into account in ASLB calculations. As for power available from other sources, the record does reveal a 200-megawatt block of unit power which NIPSCO has the option to purchase from the Indiana & Michigan Electric Company from December 1, 1977 to June 1, 1980, and which was not included in ASLB's need-for-power analysis. But according to our own calculations,[11] even if NIPSCO exercises its option to purchase the additional power, it will not be able to maintain sufficient reserve levels without the proposed facility. Nor will existence of the option alleviate the need for power after 1980, a need which petitioners' own statistics show to exist. In their motion to remand for further consideration in light of newly discovered evidence, petitioners also made reference to an August 14, 1974 Wall Street Journal article indicating that NIPSCO has contracted to buy additional power from a nuclear plant "scheduled to begin operation in the early 1980's . . .." We think ASLAB correctly denied the motion in light of the fact that no formal application to construct the plant had yet been filed, no safety reports had been made, no hearings had been held, and there was thus no indication that the project's tentative schedule could be met and, indeed, no assurance that the plant would even be built.
 
 C.
 
 21
 The last argument based on NEPA is that the AEC staff's cost-benefit analysis is deficient in several respects. It is urged that the staff, inter alia, unduly minimized the acid misting that will be caused by interaction of the vapor plume from the nuclear plant's cooling tower with emissions from the existing coal-fired plant; improperly used only a visual damage criterion to determine adverse ecological impacts; and improperly based findings that the Bailly site was environmentally superior on advantages that were available at other sites as well. We cannot agree that the staff's analysis was inadequate as alleged, for the final environmental statement explains at some length the creation and effects of acid misting, the chemical and biological impacts which operation of the plant is likely to have, and, as already noted, the environmental and economic advantages and disadvantages of the alternative sites considered. But even assuming that these deficiencies existed, we would not remand for further evaluation, since petitioners' argument ignores the independent evaluation given these considerations by ASLB after taking almost 10,000 pages of testimony following publication of the final environmental statement, and ASLAB's review of and concurrence in ASLB's determination that the environmental effects of the nuclear plant would be negligible. See Ecology Action v. United States Atomic Energy Commission, supra, 492 F.2d at 1001-1002.
 
 
 22
 Since these and the remaining arguments raised by petitioners and intervenors in their briefs are without merit, the petition for review must be denied.
 
 
 23
 We conjecture that many people who are fearful of and deeply opposed to installations of the type involved here look to the courts for the protection of a final decision on the safety and merit of the proposal. And it may be that persons on the other side of the controversy will assert, once a petition for review is denied, that a project which has been considered by a court must be safe and must have merit. Both of these lines of thought are mistaken. They assume broader judicial power in the matter than the law permits.
 
 
 24
 Our decision does not imply any opinion concerning the merits of the agency's decision. The scope of our review, defined in 5 U.S.C. § 706, is very narrow. If we find that the agency has observed the procedure required by law, complied in all respects with the governing statute and its own regulations, and based its decisions on substantial evidence, and determine that its findings and conclusions are not arbitrary, capricious, or an abuse of discretion, our duty and our authority have ended.
 
 
 25
 Petition For Review Denied.
 
 
 
 [1]
 The Atomic Energy Act of 1954, as amended and in force at the time of the agency proceedings, 42 U.S.C. §§ 2011-2282, authorized the Commission to issue licenses for the construction and utilization of any device which makes use of most kinds of nuclear fuels. 42 U.S.C. §§ 2133, 2235. With the exception of certain activities carried on at the direction of the President or under AEC supervision, the Act made it unlawful for anyone to use or transport nuclear materials without obtaining a license issued by AEC. 42 U.S.C. §§ 2121, 2131. As noted in this court's prior opinion, 515 F.2d at 516 n. 2, the Act has recently been further amended to replace AEC with the Nuclear Regulatory Commission. 42 U.S.C. §§ 5801-5891
 
 
 [2]
 In addition to ecological factors, both ASLB (RAI-74-4, 600-601) and ASLAB (RAI-74-8, 258-259, 261, 267-268) considered the "visual intrusion" upon the National Lakeshore, but found this effect to be outweighed by the necessity of additional power, the unsuitability of other sites, and the "visual intrusion" of additional long distance high voltage lines which would be needed to bring the power generated at alternative sites to NIPSCO's customers
 
 
 [3]
 The agency has also given consideration to the persons who, although not residents, may be near the site for other reasons. These include employees of the nearby plant of Bethlehem Steel Corporation, which was a party before the agency, and transient visitors to the National Lakeshore area near the reactor site. AEC has determined that radiation dosage, from operation of the plant or accidents within the realm of realistic possibility, which may be suffered by these employees and visitors and the estimated 7.3 million people who live within a 50-mile radius of the site will be insignificant. AEC points out that the possibility of a severe accident is so remote that nuclear plants throughout the country have been located on other sites having low-population zones that include federal lands. It also notes that the Department of Interior has even encouraged the inclusion of recreational facilities within such zones
 
 
 [4]
 See note 1, supra
 
 
 [5]
 The working paper, in the words of ASLAB, "neither represents nor purports to present Atomic Energy Commission policy respecting nuclear power plant sites." RAI-74-8, 254-255. Similarly, the Regulatory Guide's title page notes that "Regulatory Guides are not substitutes for regulations, and compliance with them is not required."
 
 
 [6]
 Because the working paper was inapplicable by its terms, and because it ultimately became available to petitioners, even if it was within the scope of petitioners' discovery request, as they claim, AEC's failure to produce it earlier is not reversible error. Cf. Unarco Industries, Inc. v. Evans Products Co., 403 F.2d 638, 639 (7th Cir. 1968)
 
 
 [7]
 50 C.F.R. Part 50, App. D was replaced by 50 C.F.R. Part 51 in 1974. See 39 Fed.Reg. 26279 (1974)
 
 
 [8]
 By reason of its proximity to the Bailly site, intervenor Illinois alleges that it was an "affected State" under 50 C.F.R. Part 50, App. D, A(6), was therefore entitled to be sent a copy of the preliminary report, but never received one. Eight state officials or agencies, however, including the governor, the Illinois Commission on Atomic Energy, and the Environmental Protection Division of the Attorney General's Office, did receive notice of the availability of the statement and a request for comments to be made within 75 days. No request for a copy of the statement was ever made, and the state has made no showing of prejudice from not having received a copy. Under these circumstances, we are not inclined to remand for what was, at most, a technical violation of the Commission's regulations. Cf. Environmental Defense Fund v. Tennessee Valley Authority, 492 F.2d 466, 468 n. 1 (6th Cir. 1974)
 
 
 [9]
 The following environmental disadvantages were found by the staff and summarized by ASLAB (RAI-74-8, 266-267): killing of about one quarter of the river's microbiota due to exposure to the heat of the plant's cooling system (destruction of such organisms in Lake Michigan would be insignificant by comparison); substantial increase in the salinity of the river caused by the cooling system (again, a minimal effect on Lake Michigan because of its size); and severe effects upon fish from thermal shock during shutdowns
 
 
 [10]
 The chief economic disadvantage of Schahfer was found to be the delay associated with moving there, estimated to be from two to four years. RAI-74-4, 624. Petitioners urge that this factor should not have been considered, since it was the result of NIPSCO's choice of the Bailly site. This argument is not without force, but we conclude that AEC did not abuse its discretion in deciding to consider this factor, having in mind the public interest in avoiding future shortages of power and the estimates as to when the additional power to be generated by the nuclear facility would be needed
 
 
 [11]
 ASLB Appendix II (RAI-74-4, 636) estimates NIPSCO's system capacity for the years 1973-1981 without the addition of the proposed nuclear facility, projects the demand upon the system for each year using varying rates of growth, and derives the reserve capacity. For the year 1979, ASLB estimates a system capacity of 2982 megawatts, a demand of 2778 megawatts based on a 7.5 percent rate of growth from previous years (which is less than the average annual growth rate for the past 17 years) and a reserve capacity of 7 percent. If NIPSCO exercises its option in that year, its reserve capacity is increased only to 13 percent, a figure less than both the Federal Power Commission's suggested minimum of 20-25 percent as well as NIPSCO's self-determined minimum of 15 percent